UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SELWYN JOSEPH,

   Petitioner,

 v.              19-CV-565
                 DECISION AND ORDER
WILLIAM P. BARR,
U.S. Attorney General;

KEVIN McALEENAN,
Acting Secretary, United States
Department of Homeland Security; and

JEFFREY J. SEARLS,
Facility Director,
Buffalo Federal Detention Facility,

   Respondents.

---

Selwyn Joseph is a citizen of Guyana who is detained while he awaits judicial review of his final order of removal. He has been in federal immigration detention for more than a year without an individualized hearing regarding his risk of flight or dangerousness. On May 1, 2019, Joseph filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2241, challenging the validity of his detention at the Buffalo Federal Detention Facility in Batavia, New York, Docket Item 1; on July 15, 2019, the government responded, Docket Item 7; and on August 1, 2019, Joseph replied, Docket Item 8.

For the reasons that follow, the Court conditionally grants Joseph's petition.

# FACTUAL BACKGROUND

The following facts, taken from the record, come largely from filings with the United States Department of Homeland Security, Immigration and Customs Enforcement ("DHS"). Other facts, provided by Joseph, are undisputed.

## IMMIGRATION HISTORY, TIES TO THE UNITED STATES, AND CRIMINAL PROCEEDINGS

Joseph is a thirty-two-year-old man who was born in Guyana. Docket Items 1 at 3 and 7 at 10. On March 31, 2005, Joseph lawfully entered the United States on a nonimmigrant B2 visitor visa. Docket Item 7 at 10. His visa permitted him to remain in the United States temporarily—until September 29, 2005—unless he was given further authorization. *Id.* at 64. But Joseph did not comply with the conditions of his visa: In his words, he "became an overstayer and has never returned to his native country." Docket Item 1 at 3.

In 2012, Joseph was arrested. *Id.* Although he originally was charged with petit larceny, on March 3, 2014, he pleaded guilty to one count of attempted petit larceny, a Class B misdemeanor, in a New York state court. Docket Item 7 at 53. For that charge, a judge sentenced Joseph to seven days' custody, thirty-five hours of community service, and a $250 fine. *Id.*

In the meantime, in 2013, Joseph was arrested for possession of a forged instrument. Docket Item 1 at 3. On March 3, 2015, Joseph was convicted after a jury

trial in a New York state court of one count of second-degree possession of a forged instrument. *Id.* at 52. He was sentenced to a one-year term of imprisonment. *Id.*[1]

According to Joseph, in 2016, he again was arrested for possession of a forged instrument. Docket Item 1 at 3. He says he was convicted and sentenced to "six months SHOCK incarceration at the Lakeview Correctional Facility." *Id.*[2] DHS files indicate that Joseph pleaded guilty to second degree possession of a forged instrument on August 7, 2017, and that he was sentenced to a term of two to four years' imprisonment on October 19, 2017. Docket Item 7 at 49.

**REMOVAL PROCEEDINGS**

On November 8, 2012, DHS agents found Joseph while he was detained in the Nassau County Jail in East Meadow, New York, after his arrest for petit larceny. *Id.* at 10. "After confirming his immigration status, DHS identified Joseph as a noncitizen amenable to removal from the United States." *Id.* On November 14, 2012, DHS served Joseph with a Notice to Appear, charging him with being subject to removal for having remained in the United States for longer than authorized. *Id.* at 11. On February 25, 2016, DHS served Joseph with additional charges of removability for conviction of an aggravated felony forgery offense. *Id.*

---

[1] Joseph says he was sentenced to a term of eight months' imprisonment for this crime. Docket Item 1 at 3.

[2] "The New York State Department of Corrections and Community Supervision (DOCCS) administers a Shock Incarceration Program. This program provides selected inmates a special six-month program of shock incarceration, stressing a highly structured routine of discipline, intensive regimentation, exercise, and work therapy, together with substance abuse treatment, education, pre-release counseling, and life skills counseling." New York State Department of Corrections and Community Supervision Directive #0086, http://www.doccs.ny.gov/Directives/0086.pdf.

On March 4, 2016, an immigration judge ordered Joseph removed from the United States to Guyana, *in absentia*, after Joseph failed to appear for his removal hearing. *Id*. According to Joseph, he was detained in the shock incarceration treatment program at the time of his hearing. Docket Item 1 at 3.

On October 2, 2018, the government of Guyana provided DHS with a travel document permitting DHS to deport Joseph to that country. Docket Item 7 at 36, 38-39. On October 19, 2019, Joseph moved to reopen his removal proceedings and requested that an immigration judge stay his removal. *Id*. The immigration judge granted the stay while he considered Joseph's motion to reopen, *id*. at 37, but on November 6, 2018, the immigration judge denied the motion to reopen, *id*. at 33-34.

On December 7, 2018, Joseph appealed the immigration judge's decision to the Board of Immigration Appeals ("BIA"), *id*. at 13, and, on April 23, 2019, the appeal was denied, *id*. at 20-21. In the meantime, on December 12, 2018, while Joseph's appeal was pending before the BIA, DHS attempted to remove him from the United States. *Id*. at 13. But DHS says that "he willfully refused to be removed," and Joseph was returned to the Buffalo Federal Detention Facility. *Id*.

On May 9, 2019, Joseph sought review of the BIA's decision by the United States Court of Appeals for the Second Circuit and requested that the Second Circuit stay his removal. *See Joseph v. Barr*, No. 19-1372 (2d Cir.), Docket Items 1, 4. On July 8, 2019, a Second Circuit panel issued an order staying Joseph's removal pending its consideration of his claims. Order, *Joseph v. Barr*, No. 19-1372 (2d Cir. July 8, 2019), Docket Item 67.

**DETENTION-RELATED PROCEEDINGS**

On July 16, 2018, Joseph was taken into DHS custody after his release from the custody of the New York State Department of Corrections and Community Supervision. Docket Item 7 at 36. On October 29 and December 21, 2018, and again on March 14, 2019, DHS provided Joseph with a notice that, among other things, "informed [him] that his custody status has been reviewed and it has been determined that [he] will not be released from the custody of the U.S. Immigration and Customs Enforcement (ICE) at this time." *Id.* at 13, 22-23, 25-26, 35-36. Each notice said "[t]his decision has been made based on a review of your file and/or your personal interview and consideration of any information you submitted to ICE's reviewing officials." *Id.*

Joseph remains detained at the Buffalo Federal Detention Facility.

**CONDITIONS OF CONFINEMENT**

In his petition, Joseph provides the following information about his confinement at the Buffalo Federal Detention Facility, comparing it with the conditions in the New York State prisons where he had served his sentences:

> Petitioner, as many others, are in lockdown for about eighteen hours daily. Petitioner is confined with another inmate, being forced to perform his ablutions and waste eliminations with another man in the same cell. In the penal institution Petitioner was confined in, inmates are confined to single cells or a dorm with appropriate hygiene facilities. The penal institutions with dorms, all have individual cubes. There are communal washrooms and showers. There are no lockdowns, except in the case of disturbances. Inmates have the ability to be in the recreation yards, even in the midst of winter.
>
> Yes, at BFDF this Petitioner's detention is indeed meaningfully different and stressful, compared to his New York State detention.

Docket Item 1 at 7-8.  For its part, DHS submitted an affidavit from a DHS deportation officer attesting to the following conditions of confinement at the Buffalo Federal Detention Facility:

> As a noncitizen in DHS custody, Joseph is permitted to be out of his cell during the day and permitted to move about in the common area within his unit in the detention facility.

Docket Item 7 at 15.

## **DISCUSSION**

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).  The government maintains that Joseph is validly detained under 8 U.S.C. § 1226(c).  Docket Item 7-1 at 8.  Joseph does not necessarily dispute that he is detained under the mandatory detention provisions in that statute, Docket Item 1 at 4, but he and the government disagree as to whether his detention under the statute "comport[s] with the 'fundamental fairness' demanded by the Due Process Clause," *Schall v. Martin*, 467 U.S. 253, 263 (1984) (quoting *Breed v. Jones*, 421 U.S. 519, 531 (1975)).  Docket Items 1 at 4, 6, 8; 7-1 at 9-11.  Joseph argues that DHS has "willfully chosen to subject [him] to enforced prolonged and languishing illegal detention, bordering on incarceration, and has violated the laws, Constitution and treaties of the United States, by never allowing [him] a Bond Hearing."  Docket Item 1 at 1.  He also argues that his detention has been unreasonably prolonged, *id.* at 6-8, and he asks this Court to "order that a bond hearing be granted [him], before an impartial adjudicator of facts, within fourteen days of this Court's order," *id.* at 8.

6

Because Joseph is proceeding *pro se* this Court holds his submissions "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

The Fifth Amendment's Due Process Clause forbids the federal government from depriving any "person . . . of . . . liberty . . . without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "[G]overnment detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections . . . or, in certain special and 'narrow' nonpunitive 'circumstances,' . . . where a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (internal citations omitted) (emphasis in original). Other than those unique, special, and narrow circumstances, "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty. That promise stands as one of the Constitution's most vital protections against arbitrary government." *United States v. Haymond*, 139 S. Ct. 2369, 2373 (2019) (Gorsuch, J., announcing the judgment of the Court and delivering an opinion).

"Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("It is true that aliens who have

7

once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").

The Due Process Clause is not offended by the mandatory detention of aliens for the "*brief period necessary* for their removal proceedings," *Demore v. Kim*, 538 U.S. 510, 513 (2003) (emphasis added), but it may be if that "continued detention bec[omes] unreasonable or unjustified." *id.* at 532 (Kennedy, J., concurring). For that reason, this Court "has evaluated procedural due process challenges to immigration detention with a two-step inquiry." *Hemans v. Searls*, 2019 WL 955353, at *5 (W.D.N.Y. Feb. 27, 2019); *see, e.g., Clerveaux v. Searls*, 2019 WL 3457105, at *3 (W.D.N.Y July 31, 2018); *Rosado Valerio v. Barr*, 2019 WL 3017412, at *3 (W.D.N.Y. July 10, 2019); *Fallatah v. Barr*, 2019 WL 2569592, at *3 (W.D.N.Y. June 21, 2019); *Campbell v. Barr*, 2019 WL 2106387, at *4 (W.D.N.Y. May 14, 2019); *Sankara v. Barr*, 2019 WL 1922069, at *6 (W.D.N.Y. Apr. 30, 2019); *Fremont v. Barr*, 2019 WL 1471006, at *4 (W.D.N.Y. Apr. 3, 2019); *Hechavarria v. Sessions*, 2018 WL 5776421, at *9 (W.D.N.Y. Nov. 2, 2018). "As the first step, the Court considers whether the alien's detention has been unreasonably prolonged." *Hemans*, 2019 WL 955353, at *5. "If it has not, then there is no procedural due process violation." *Id.* "But if it has, the Court proceeds to step two and 'identifies the specific dictates of due process.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). If the government has not provided the procedural safeguards required by the Due Process Clause to an alien subject to unreasonably prolonged detention, "then his continued detention violates procedural due process." *Id.*

8

## I.  JOSEPH'S UNREASONABLY PROLONGED DETENTION

In *Demore*, the Court explicitly noted that "in the majority of cases [that the Court analyzed involving detention pending a determination of removability, detention] lasts less than the 90 days . . . considered presumptively valid in *Zadvydas*." 538 U.S. at 529.  Diving even deeper, the Court noted that "in 85% of the cases in which [those] aliens are detained . . . removal proceedings are completed in an average time of 47 days and a median of 30 days." *Id.*  And "[i]n the remaining 15% of cases, in which the alien appeals the decision of the Immigration Judge to the [BIA], appeal takes an average of four months, with a median time that is slightly shorter." *Id.*  Although there is no bright-line rule in determining whether detention has become unreasonably prolonged, *see Hechavarria*, 2018 WL 5776421, at *5-*6, "courts become extremely wary" of concluding that detention is *not* unreasonably prolonged "[a]s detention continues past a year." *See Muse v. Sessions*, 2018 WL 4466052, at *4 (D. Minn. Sept. 18, 2018); *see also Reid v. Donelan*, 2019 WL 2959085, at *9-*10 (D. Mass. July 9, 2019) ("detention is likely to be unreasonable if it lasts for more than one year during removal proceedings before the agency, excluding any delays due to the alien's dilatory tactics," but "[t]his one-year period is not a bright line.").

"[W]hen weighing the lawfulness of continued detention of an alien under the Due Process Clause," several factors determine whether detention is unreasonably prolonged.  *Jamal A. v. Whitaker*, 358 F. Supp. 3d. 853, 858-59 (D. Minn. 2019).  For example, this Court has considered "(1) the total length of detention to date; (2) the conditions of detention; (3) delays in the removal proceedings caused by the parties; and (4) the likelihood that the removal proceedings will result in a final order of removal."  *Hemans*, 2019 WL 955353, at *6.

First and most important, courts consider the length of detention. "The total length of the detention is the most important factor." *Reid*, 2019 WL 2959085, at *9. Joseph has been in DHS custody since July 16, 2018—more than a year and much longer than the four-month average period contemplated in *Demore*. *See* 538 U.S. at 529; *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 864 (2018) (Breyer, J., dissenting) (individuals with mental illness "dangerous to themselves or to others may be confined involuntarily . . . [with] the right to review the circumstances at least annually."). As this Court has noted, "courts have found detention shorter than a year to be unreasonably prolonged as part of a procedural due process analysis." *Fremont*, 2019 WL 1471006, at *4 (and cases cited therein). Because Joseph's detention has surpassed the one-year period by which time "detention is likely to be unreasonable," *Reid*, 2019 WL 2959085, at *9, this factor supports his argument that his detention without an individualized hearing has been unreasonably prolonged.

Second, courts consider the conditions of detention. "Whether 'the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention' factors into the reasonableness of [Joseph's] detention." *Jamal A.,* 358 F. Supp. 3d at 860 (quoting *Sajous v. Decker*, 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018)). "The more that the conditions under which the alien is being held resemble penal confinement, the stronger his argument that he is entitled to a bond hearing." *Id.* (quoting *Muse*, 2018 WL 4466052, at *5).

This factor also favors a determination that Joseph's detention has been unreasonably prolonged. The government concedes that Joseph is detained in a "cell," and although the government says that he "is permitted to be out of his cell during the

day and permitted to move about in the common area within his unit in the detention facility," Docket Item 7 at 15, it does not dispute Joseph's claim that he is "in lockdown for about eighteen hours daily," Docket Item 1 at 7. Nor does it dispute Joseph's claim that he must use the bathroom without privacy "with another man in the same cell." *Id*. at 7. For what it is worth, Joseph subjectively feels that his current detention is worse than his New York State incarceration, complaining that it is "indeed meaningfully different and stressful, compared to his New York State detention." *Id*. at 8. In light of all that, the record suggests that Joseph's confinement at the BFDF "is 'indistinguishable from penal confinement.'" *Jamal A.*, 358 F. Supp. 3d at 860 (quoting *Muse*, 2018 WL 4466052, at *5).

Third, courts consider whether either side is responsible for delay. The Second Circuit has indicated that this factor weighs against finding detention unreasonably prolonged when an alien has "'substantially prolonged his stay by abusing the processes provided to him,'" but not when "an immigrant . . . [has] simply made use of the statutorily permitted appeals process." *Hechavarria v. Sessions*, 891 F.3d 49, 56 n.6 (2d Cir. 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)).

In this case, on March 4, 2016, after Joseph did not appear for his hearing, an immigration judge ordered Joseph removed to Guyana. Docket Item 7 at 11. Joseph did not appeal that decision to the BIA. *See id*. Instead, on October 19, 2018, after Guyana provided Joseph's travel documents to DHS, Joseph asked an immigration judge to reopen his removal proceedings. *Id*. at 36, 38-39. On November 6, 2018, the immigration judge denied that motion, *id*. at 33-34, and on December 7, 2018, Joseph filed an appeal with the BIA, *id*. at 13. The BIA denied his appeal on April 23, 2019, *id*.

11

at 20-21, and on May 9, 2019, Joseph sought judicial review of the BIA's decision, *Joseph v. Barr*, No. 19-1372 (2d Cir.), Docket Item 1. Joseph now awaits a decision by the Second Circuit.

As the government observes, "Joseph's continued detention is largely attributable to Joseph's . . . own litigation strategy." Docket Item 7-1 at 9. On the other hand, "appeals and petitions for relief are to be expected as a natural part of the process. An alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him." *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir. 2003) (cited in *Hechavarria*, 891 F.3d at 56 n.6). Indeed,

> although an alien may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take. The mere fact that an alien has sought relief from deportation does not authorize the [government] to drag its heels indefinitely in making a decision. The entire process, not merely the original deportation hearing, is subject to the constitutional requirement of reasonableness.

*Id.*

It is true that Joseph did not show up for his original removal hearing in 2016 and was therefore ordered removed *in absentia*. And it also is true that Joseph did not appeal that decision; instead, he collaterally attacked that removal order and sought to reopen those proceedings. If Joseph actually received notice of the hearing and was able to be there, his failure to show up and to timely appeal that decision may be good reason to find that his continued detention without a hearing is reasonable. But this is not a case where the alien "has not provided an explanation why" he failed to show up for his removal hearing and to appeal his initial removal order. *See e.g, Sankara*, 2019 WL 1922069, at *7. Indeed, the reason Joseph argues that his removal proceedings

12

should be reopened is precisely that "he did not appear in [immigration] court because he was incarcerated."  Docket Item 7 at 33.

What is more, the immigration judge who denied Joseph's motion to reopen acknowledged that if Joseph was unable to appear at his removal hearing because he was incarcerated, then under the applicable regulations and the Immigration and Nationality Act the removal proceeding might well need to be reopened, *see id.* (citing 8 C.F.R. § 1003.23(b)(4)(ii)).  But the immigration judge found that Joseph provided "insufficient evidence" that he was incarcerated at the time.  Docket Item 7 at 34.  The BIA affirmed the immigration judge's reasoning, *see id.* at 20-21, and whether the BIA validly decided to do just that is the question now pending before the Second Circuit.  Given all that, this Court declines to resolve issues that overlap closely with questions pending before the Second Circuit.

On the other hand, it is unclear why Joseph waited three months to move to reopen his removal proceedings.  Joseph has been in DHS custody since his release from state custody on July 16, 2018, Docket Item 7 at 36, but he waited until October to ask an immigration judge to reopen his removal proceedings.  Even considering Joseph's pro se status, the three-month delay in asking an immigration judge to reopen his case should count against him.

Although the immigration judge acted swiftly in denying Joseph's motion (and Joseph quickly appealed that decision to the BIA), the BIA then took more than four months to decide Joseph's appeal, and Joseph cannot be held responsible for that time.  *See Ly*, 351 F.3d at 272.  Likewise, Joseph is not responsible for the time that his

13

petition has been pending before the Second Circuit.  *See id.*  So while Joseph may be responsible for part of the delay, that part is relatively short.

The larger context—the context of what precisely is being litigated before the Second Circuit—also factors into the analysis.  Basically, the government is refusing Joseph a hearing where he will be able to argue against his deportation.  The government has now spent about ten months litigating with Joseph over its authority to deny him that hearing.  If the Second Circuit decides that the agency abused its discretion in denying Joseph's motion to reopen, then the agency will find itself back at square one: Joseph will get a hearing and additional opportunities to seek review of any adverse decisions.  On the other hand, had DHS simply not opposed the hearing that Joseph requested and instead argued about the merits, DHS would avoid two rounds of litigation and the additional cost of Joseph's lengthy detention.[3]  In other words, the government could have simply provided Joseph with the merits hearing he requested, gotten it over with, and expedited this whole process, instead of choosing to litigate for many months about its decision to deny him that hearing.  If Joseph's decision to fight his removal cuts against him, then this factor certainly weighs against the government and in favor of a finding that Joseph's detention has been unreasonably prolonged.

Finally, courts consider the likelihood that the removal proceedings will result in a final order of removal.  In this case, as addressed above, Joseph did not appeal his final order of removal directly to the BIA or to the Second Circuit.  Therefore, Joseph must first convince the Second Circuit that the agency erred in denying his motion to reopen;

---

[3] And, at least in the federal courts, there is generally a "strong 'preference for resolving disputes on the merits.'"  *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005) (quoting *Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 514 (2d Cir. 2001)).

14

only if he is successful in that endeavor will he be able to make his case against removal. Because immigration judges have "broad discretion . . . 'to grant or deny a motion to reopen,'" *Kucana v. Holder*, 558 U.S. 233, 250 (2010) (quoting 8 C.F.R. § 1003.2), and because Joseph must win twice to succeed, this factor weighs against finding that Joseph's detention has been unreasonably prolonged.

Nevertheless, after weighing all the factors, and especially the length of detention, this Court finds that Joseph's detention has been unreasonably prolonged. Therefore, this Court turns to the second step of the two-part inquiry to determine what remedy, if any, that demands.

## II. THE PROCESS DUE TO JOSEPH

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors," *id.* at 335, "(A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake," *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017). Here, that analysis leads to the conclusion that Joseph's continued detention without a robust hearing fails to "comport with the 'fundamental fairness' demanded by the Due Process Clause." *Schall*, 467 U.S. at 263 (quoting *Breed*, 421 U.S. at 531).

### A. The Interests at Stake

Joseph's interest in his freedom pending the conclusion of his removal proceedings deserves great "weight and gravity." *Addington v. Texas*, 441 U.S. 418,

15

427 (1979).  Joseph has an obvious interest in his "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint." *Zadvydas*, 533 U.S. at 690.  Moreover, while "[t]he private interest here is not liberty in the abstract, but liberty *in the United States*," Joseph has not "*concede[d]* all elements that require removal." *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999) (emphasis in original). Indeed, Joseph is litigating over an opportunity to present those claims to a neutral decision maker.

Joseph's petition provides little information about his ties to the United States that strengthen his liberty interests in being free from detention in this country as opposed to being free from detention in Guyana.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (losing "the right to rejoin [one's] immediate family [is] a right that ranks high among the interests of the individual").  But the government does not argue that Joseph lacks any such ties.  Because of Joseph's pro se status, and because "[t]his Court has come to believe that no rational person would subject himself or herself to unreasonably prolonged detention in a jail-like detention facility unless that person's liberty interests in remaining in the United States are quite strong," *Fremont*, 2019 WL 1471006, at *6 n.7, the Court presumes that Joseph has a substantial interest in release from detention in the United States.

The government's interests in detaining Joseph also may be strong.  The government argues that "the justification for 8 U.S.C. § 1226(c) [detention] is based upon the Government's concerns over the risks of flight and danger to the community." Docket Item 7-1 at 10 (quoting *Demore*, 538 U.S. at 531).  And the government notes that "Joseph stands convicted of . . . three crimes," suggesting that its interest in

detaining him is based on the risk he poses of danger to society. *Id.* "The government's interest in preventing crimes by arrestees is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987). In addition, general concerns about the risk of flight highlight the government's compelling interest in preserving its "ability to later carry out its broader responsibilities over immigration matters." *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991). If Joseph's detention serves these legitimate and compelling ends, they "outweigh[ his] 'constitutionally protected interest in avoiding [prolonged] physical restraint.'" *Zadvydas*, 533 U.S. at 690 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)).

### B. The Risk of Erroneous Deprivation of Liberty

In light of the procedures used thus far, there is a significant risk of an erroneous deprivation of Joseph's liberty interests. DHS reviewed Joseph's custody when the government believed that he was detained under 8 U.S.C. § 1231(a). In one decision to continue detention, DHS recited Joseph's nonviolent offenses and concluded that he has "shown a wanton disregard for the laws of the United States." Docket Item 7 at 35-36. "Due process is not satisfied, however, by rubberstamp denials based on temporally distant offenses." *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 398 (3d Cir. 1999). "The process due even to excludable aliens requires an opportunity for an evaluation of the individual's current threat to the community and his risk of flight." *Id.* And in its other decisions to continue detention, DHS determined that Joseph's detention was warranted because he "failed to comply with ICE's efforts to remove [him] to [his] native country." Docket Item 7 at 22-23, 25-26. But that does nothing more than acknowledge

that Joseph does not want to be removed pending a final decision on his case; it does not address why detention is warranted while he fights his removal.

### C.   The Remedy

The Due Process Clause requires a hearing that "satisfies the constitutional minimum of fundamental fairness," *Santosky v. Kramer*, 455 U.S. 745, 756 n.8 (1982) (internal citations omitted), with respect to whether a "special [compelling] justification . . . outweighs '[Joseph's] constitutionally protected interest in avoiding [unreasonably prolonged] physical restraint," *Zadvydas*, 533 U.S. at 690 (quoting *Hendricks*, 521 U.S. at 356). To sustain the prolonged detention of an alien who has been admitted to the country and is subject to removal proceedings, "the [g]overnment [is] required, in a 'full-blown adversary hearing,' to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person,'" *Foucha*, 504 U.S. at 81 (quoting *Salerno*, 481 U.S. at 751), or ensure that the alien will appear for any future proceeding.[4] This requires consideration of less restrictive alternatives to detention. *See id. Cf. United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When a plausible, less restrictive alternative is offered to a" regulation burdening a constitutional right, "it is the

---

[4] As this Court explained in *Hemans v. Searls*, 2019 WL 955353, at *8 n.7 (W.D.N.Y. Feb. 27, 2019), a pretrial detainee's right to a speedy trial distinguishes the interests supporting the evidentiary standard traditionally applied to flight risk determinations for pretrial detention purposes from what is required after an unreasonably prolonged immigration detention. *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (quoting *Addington v. Texas*, 441 U.S. 418, 424 (1979)) ("clear and convincing evidence" standard applies "when the individual interests at stake in a . . . proceeding are both 'particularly important' and 'more important than mere loss of money'").

Government's obligation to prove that the alternative will be ineffective to achieve its goals."); *see also Doherty v. Thornburgh*, 750 F. Supp. 131, 139 (S.D.N.Y. 1990), *aff'd*, 943 F.2d 204 ("evidence is overwhelming that [alien], if released, would pose such a substantial risk of flight that no conditions of bail could reasonably assure his surrender for deportation.").

Joseph's § 1226(c) detention has been unreasonably prolonged, and § 1226(c) does not require an individualized hearing where the government must demonstrate by clear and convincing evidence that no conditions of release can reasonably serve the government's compelling regulatory interests in detaining him. *See Jennings*, 138 S. Ct. at 846-47. The statute therefore is unconstitutional as applied to him, and his continued detention violates the Due Process Clause.[5]

---

[5] Joseph's petition also seeks his immediate release because "there is no likelihood that he will be removed to Guyana in the reasonably foreseeable future." Docket Item 1 at 8. "[D]etention of an alien 'once removal is no longer reasonably foreseeable' . . . violates the Due Process Clause." *Wang v. Ashcroft*, 320 F.3d 130, 146 (2d Cir. 2003) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001)). But because Joseph "has been granted a stay of removal while his petition for review is pending" before the Second Circuit, the clearest "impediment to his removal" is "review by [that] Court." *Hechavarria v. Sessions*, 891 F.3d 49, 57 (2d Cir. 2018). Joseph's § 1226(c) detention "has 'a definite termination point': the conclusion of removal proceedings." *Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018) (quoting *Demore v. Kim*, 538 U.S. 510, 529 (2003)). And there is nothing in the record to indicate that the Second Circuit will resolve his claims at a point beyond the reasonably foreseeable future. "Given the fact that . . . review [of Joseph's claims before the Second Circuit have] not been completed, it would make no sense to" analyze the reasonableness of his detention under the same parameters as those for "aliens who have no remaining [legal] barriers preventing their immediate removal." *Hechavarria*, 891 F.3d at 57. Therefore, to the extent Josephs makes this substantive due process argument in favor of his immediate release, it is denied.

## **CONCLUSION**

For the reasons stated above, Joseph's petition, Docket Item 1, is conditionally GRANTED. **Within fourteen days of the date of this decision and order**, the government must release Joseph from detention unless a neutral decision maker conducts an individualized hearing to determine whether his continued detention is justified. At any such hearing, the government has the burden of demonstrating by clear and convincing evidence that Joseph's continued detention is necessary to serve a compelling regulatory purpose, such as protecting against danger to the community or risk of flight. Whether detention is necessary to serve a compelling regulatory purpose requires consideration of whether a less restrictive alternative to detention would also address the government's interests. In other words, Joseph must be released unless a neutral decision maker finds by clear and convincing evidence that no condition or combination of conditions of release can reasonably assure Joseph's appearance and the safety of the community or any persons.

SO ORDERED.

Dated: August 15, 2019
Buffalo, New York

*s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE